

**TO BE FILED UNDER SEAL – TO BE FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA AND COMMONWEALTH OF VIRGINIA Ex rel., | Civil Action No. 4:21cv52 |
| ASHLEY SCHWARTZ, | |
| PLAINTIFFS | COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT AND THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT |
| v. | |
| CONNEX FAMILY SERVICES LLC, BIANCA MARIE RIDDLE, KATIA RIDDLE, LISA LIGUORI, and EMMA MALGREM. | JURY TRIAL DEMANDED |
| DEFENDANTS. | FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |

Relator, Ashley Schwartz ("Relator" or "Schwartz"), by counsel, brings this action on her own behalf as well as on behalf of the United States of America (the "United States") and the Commonwealth of Virginia (the "Commonwealth") against Defendants Bianca Marie Riddle, Katia Riddle, Lisa Liguori, and Emma Malgrem in their individual capacities (collectively, the "Individual Defendants"), as well as against Defendant Connex Family Services, LLC ("Connex") (collectively, the "Defendants").

**PRELIMINARY STATEMENT**

1.     This is an action to recover damages and civil penalties on behalf of the United States and the Commonwealth based on knowingly false or fraudulent statements, records, or claims that were made, submitted, or caused to be made or submitted by Defendants to the United

1

States and the Commonwealth or knowing efforts by Defendants to conceal, avoid, or decrease obligations to pay or transmit money to the United States and the Commonwealth in violation of the False Claims Act, 31 U.S.C. § 3729 et seq. (the "FCA") and the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 et seq. (the "VFAT").

2.     Defendants are adolescent therapy providers that engaged in a series of schemes to defraud the United States and the Commonwealth by, inter alia, submitting bills to the Medicaid program for services performed by unlicensed providers, misrepresenting the nature of services in Medicaid bills, and inflating bills to receive payments for services that were never performed.

## PARTIES

3.     Relator Ashley Schwartz is an individual domiciled in the Commonwealth of Virginia. Schwartz was employed by Connex from February to December 2020.

4.     Defendant Connex is a Virginia Limited Liability Company with a principal place of business in Manassas, Virginia. Connex purports to provide Applied Behavioral Analysis ("ABA") Therapy to children who have been diagnosed with Autism Spectrum Disorder and other related disorders. Connex offers services to patients throughout Northern Virginia and has offices in Gloucester, Manassas, and Westmorland, Virginia.

5.     Defendant Lisa Liguori is a Board-Certified Behavior Analyst ("BCBA") domiciled in La Quinta, California. Liguori is a co-Clinical Director and co-owner of Connex. Upon information and belief, Liguori is also a co-owner of a separate entity in Colorado called Moving Boulders ABA Services Inc. ("Moving Boulders"), which provides substantially the same services as Connex.

6.     Defendant Emma Malgrem is a BCBA domiciled in Manassas, Virginia. Malgrem is a co-Clinical Director and co-owner of Connex.

2

7.      Defendant Bianca Marie Riddle is an individual domiciled in Gloucester, Virginia. Bianca Riddle was co-owner of Connex at the time during which Schwartz was employed there. Upon information and belief, Riddle is currently a co-owner of Moving Boulders. Bianca Riddle is not a BCBA nor licensed in any other way to provide behavioral or clinical therapy.

8.      Defendant Katia Riddle is an individual domiciled in Gloucester, Virginia. Katia Riddle is the sister of Bianca Riddle and was also a co-owner of Connex during the time which Schwartz was employed there. During Schwartz's tenure at Connex, Katia Riddle also served as the Finance and Production Manager at Connex. Katia Riddle is not a BCBA nor licensed in any other way to provide behavioral or clinical therapy.

### JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Relator's claims under the FCA pursuant to 28 U.S.C. § 1331.

10.     The Court has supplemental jurisdiction over Relator's state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Relator's federal claims, the claims derive from a common nucleus of operative fact as Relator's federal claims, and the exercise of supplemental jurisdiction would be in the interest of judicial economy, convenience, fairness, and comity.

11.     Venue is proper in this court pursuant to 28 U.S.C. § 1391 because it is a judicial district in which a substantial part of the events or omissions giving rise to this claim occurred.

12.     Venue is also proper is this court pursuant to 31 U.S.C. § 3732 because it is a judicial district in which any one defendant can be found, resides, transacts business, or in which acts proscribed by 31 U.S.C. § 3729 occurred.

## FACTUAL BACKGROUND

### A. Connex's business model and ABA Therapy

13. Connex was formed in or around 2015 by Bianca and Katia Riddle.

14. Connex's stated business practice is to provide Applied Behavioral Analysis ("ABA") Therapy for children from the ages of 18 months to 21 years who have been diagnosed with Autism Spectrum Disorder ("ASD") and related disorders.

15. ABA Therapy is a form of psychological therapy used to treat developmental conditions, including ASD.

16. ABA Therapy involves the design, implementation, and evaluation of environmental modifications to improve social, communication, and learning skills.

### i. Licensure Requirements

17. To practice ABA Therapy in the Commonwealth, providers must be licensed. *See* 18 VAC § 85-150-110

18. Applicants seeking licensure in the Commonwealth must first obtain certification as a BCBA or Board Certified Assistant Behavioral Analyst ("BCaBA"). *See id.*

19. To become a BCBA, individuals must obtain a master's or doctorate degree in psychology, education, or behavior analysis and also pass a national certification exam administered by the Behavior Analyst Certification Board ("BACB").

20. To become a BCaBA, individuals must obtain a graduate degree in Applied Behavioral Analysis and also be certified by the BACB.

### ii. Supervisory Requirements

21. Though both licensed BCBAs and BCaBAs may practice ABA Therapy in the Commonwealth, BCaBAs may only do so under the supervision of a BCBA. *See* 18 VAC § 85-

150-120.

22.     The extent and frequency with which a BCBA may delegate tasks to a BCaBA depends on the specific circumstances and the needs of the patient; however, BCBAs may only delegate where "the tasks or procedures can be properly and safely performed by an appropriately trained [BCaBA] . . . and the delegation does not jeopardize the health or safety of the client." *See* 18 VAC § 85-150-120(C).

23.     Moreover, BCaBAs must undergo direct BCBA supervision at least one hour every four weeks. *See* 18 VAC § 85-150-120(E).

24.     In addition, both BCBAs and BCaBAs may rely on Behavioral Technicians ("BTs") to assist them in the provision of ABA Therapy.

25.     BTs are not licensed to provide ABA Therapy and may only perform limited functions under the supervision of licensed providers.

26.     In general, BTs are permitted to perform "[n]onclient-related tasks" such as "clerical and maintenance activities," as well as "[c]ertain routine client-related tasks that, in the opinion of and under the supervision of a [BCBA or BCaBA], have no potential to adversely impact the client or the client's treatment plan and do not constitute the practice of behavior analysis." 18 VAC § 85-150-120(E).

iii.     **Developing Treatment Plans**

27.     ABA Therapy is generally performed in accordance with a treatment plan, also known as an Individual Service Plan ("ISP") that is developed and periodically amended by a licensed provider.

28.     To develop an ISP, a licensed provider must first perform an initial assessment of the patient. During an initial assessment, the licensed provider collects relevant background

information about the patient and makes real-time direct observations of the patient to measure and record behavior.

29.　　The ultimate goal of the initial assessment is to identify behavior and skill deficits that can be improved through behavioral therapy.

30.　　After the initial assessment is complete, the licensed provider develops an ISP customized to the needs of the patient.

31.　　The ISP contains a series of behavioral goals and specific activities or exercises that can be used to accomplish those goals.

32.　　For example, an ISP might outline a goal for the patient to become more accustomed to sharing toys with others and then identify a series of turn-taking activities that caregivers and treatment providers can perform with the patient to help accomplish the goal.

### iv.　　Executing Treatment Plans

33.　　Though licensed providers are ultimately responsible for executing ISPs, they often delegate the task of carrying out the specifics of the ISP to BTs.

34.　　BTs periodically meet with patients either in the patients' home or at a treatment center to perform the specific exercises or activities outlined by the licensed provider in the ISP.

35.　　The BT then records the activities performed with the patient, as well as the patient's progress, in a document called a data sheet.

36.　　Licensed providers are responsible for reviewing data sheets to determine whether the patients' progress calls for any amendments to the treatment plan or some other form of intervention by the provider.

37.　　Additionally, licensed providers may rely, in part, on data sheets to determine when the treatment goals have been accomplished and when the patient may be discharged.

**B. Medicaid reimbursement for ABA Therapy**

**i.      Medicaid Generally**

38.      Medicaid is a jointly financed state and federal program established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.

39.      Medicaid pays for medical care, including certain mental health services, for individuals who lack the income or resources to pay for care.

40.      Federal law identifies certain mandatory benefits that states must offer to receive federal assistance under the Medicaid program as well as optional benefits that may elect to provide. Each state describes services that will be offered in a Medicaid plan, which must be approved by the Centers for Medicare & Medicaid Services ("CMS").

41.      In the Commonwealth, the Medicaid program is administered by the Department of Medical Assistance Services ("DMAS").

42.      Among other things, the DMAS develops and oversees the regulatory framework for submitting and receiving Medicaid payments in the Commonwealth.

43.      To receive Medicaid payments or reimbursements in the Commonwealth, DMAS requires that providers participate in a managed care organization ("MCO"). An MCO is a network of providers with which DMAS contracts to provide services to its members.

**ii.      Medicaid Compliance**

44.      All states, including the Commonwealth, require prospective Medicaid providers to agree that they will comply with all Medicaid requirements, including the fraud and abuse provisions.

45.      Moreover, under federal law, Medicare-certified institutional providers are required to submit an "annual cost report" to a Medicare Administrative Contractor ("MAC").

7

46.     Annual cost reports contain information such as facility characteristics, utilization data, and costs and charges by the institution.

47.     In addition, where a provider learns that they have received any overpayment from Medicaid, they are required to "notify and return the overpayment to the Secretary [of Health and Human Services ("HHS")], the State, an intermediary, a carrier, or a contractor." 42 U.S.C. § 1320a-7k(d)(1)(A).

48.     By statute, overpayments that are retained and not timely reported are considered an "obligation" under § 3729(b)(3) of the FCA.

iii.     **Medicaid Eligibility for ABA Therapy**

49.     Under DMAS regulations, ABA Therapy services are covered by the Medicaid program. *See* COMMUNITY MENTAL HEALTH REHABILITATIVE SERVICES SUPPLEMENT, Behavioral Therapy (Aug. 22, 2018) ("Hereinafter DMAS Manual").

50.     Specifically, coverage is permitted for individuals under the age of 21 for whom DMAS has determined require medically necessary treatment to correct or ameliorate developmental, behavioral, or mental disabilities. *See id.* at 6.

51.     As a general rule, Medicaid reimburses ABA therapy providers at a rate of $60 per hour or $15 per "unit," which is equivalent to 15 minutes of service.

52.     Billed time is required to "match the documented time rendering the service" and providers are specifically instructed by DMAS **not to "round up"** for partial units of service. *Id.* at 22.

53.     To qualify for Medicaid payments, providers are required to follow a comprehensive set of eligibility criteria.

54.     First, providers must be licensed by the Commonwealth to provide ABA Therapy.

*See id.* at 3, 5.

55.     Typically, licensed providers include BCBAs or supervised BCaBAs.

56.     Though licensed providers may rely on support staff, such as BTs, to perform certain tasks, they must strictly follow DMAS's treatment standards to maintain eligibility. *See id.* at 5.

57.     For instance, initial assessments **must be performed by a licensed provider through face-to-face interaction with both the child and the child's family or caregiver.** Licensed providers are required to update these initial assessments at least annually. *See id.* at 12.

58.     In addition, ISPs must also be **created by a licensed provider and use information gathered during the provider's initial assessment.** *See id.* at 13-15.

59.     The licensed provider is also required to review and update the ISP within 30 days of the initiation of services. Thereafter, the licensed provider is required to review the ISP at least every three months and evaluate the patient's progress toward meeting ISP goals. *See id.*

60.     Licensed providers are also subject to certain supervisory requirements. For instance, licensed providers are required to supervise unlicensed staff, such as BTs, at least weekly by reviewing progress notes and data, as well as conversing with staff about the patient's progress and the effectiveness of the ISP. *See id.* at 15.

61.     Licensed providers must also create signed documents evidencing their weekly supervision of unlicensed staff. *See id.*

62.     Furthermore, ABA Therapy providers may only bill for services that are performed for individual patients; in other words, providers may not seek reimbursement for group therapy sessions. *See id.* at 22-23.

63.     Ultimately, ABA Therapy providers may only be reimbursed for services that

satisfy DMAS's eligibility criteria.

### C. Relator's Role at Connex

64.     Connex hired Relator Ashley Schwartz in February 2020 as an BT.

65.     At the time Schwartz was hired, Bianca and Katia Riddle sat on the Connex Board of Directors, along with their mother, Barbara Riddle.

66.     During Schwartz's tenure at Connex, Defendant Liguori served as a co-Clinical Director at Connex, along with non-parties Emma Malgrem and Jonathan Redding.

67.     Ligori, Malgrem, and Redding were licensed BCBAs.

68.     Ligori and Malgrem were primarily responsible for operating the Manassas office while Bianca Riddle operated the Gloucester office.

69.     Schwartz worked primarily in the Gloucester office with Bianca Riddle.

70.     In July 2020, Connex promoted Schwartz to Regional Manager of the Gloucester and Westmorland offices.

71.     As Regional Manager, Schwartz was primarily responsible for coordinating schedules with patients, licensed providers, and BTs in Gloucester and Westmorland.

72.     Schwartz was not responsible for patient billing, nor was Schwartz regularly given access to billing records or documents; rather, the information Schwartz obtained to support her claims in this action came largely from records or evidence viewed or obtained outside the scope of her normal job duties.

73.     Defendant Katia Riddle was primarily responsible for overseeing patient billing at the direction of Bianca Riddle.

74.     Though Schwartz was initially grateful for the opportunity to work for Connex and excited about the prospect of helping patients in need, she gradually began to recognize that

Connex was not the entity that it portrayed itself to be.

75.     Within months, Schwartz had discovered a myriad of fraudulent schemes perpetuated by Defendants that were designed to unlawfully and fraudulently procure payments from the Medicaid program.

**D. Defendants' Fraudulent Activities**

**i.     Billing Medicaid for Services Performed by Unlicensed Providers**

76.     Schwartz's principal job at Connex as a BT was to perform treatment for patients in accordance with ISPs.

77.     Typically, Schwartz and other BTs at the Gloucester office received direction from Bianca Riddle, who would assign patients to Schwartz and other BTs and provide the BTs with a patient's ISP.

78.     At the time Schwartz started at Connex, Redding was the only licensed BCBA working out of the Gloucester office; accordingly, Schwartz assumed that Redding had been drafting the ISPs on which Schwartz and the other BTs were basing their treatment.

79.     Schwartz was unable to confirm this for some time, however, because Redding rarely appeared in the office.

80.     In March 2020, Redding came to the Gloucester location to complete some administrative work.

81.     At that time, Schwartz had been treating Patient CU based on an ISP that listed Redding as the drafter.

82.     Schwartz approached Redding about the case because she had some questions about the treatment plan. But when Schwartz asked Redding about the patient, he was confused and informed Schwartz that he had not treated, nor did he even know Patient CU.

11

83.     On that same day, Schwartz approached Bianca Riddle about the ISP for Patient CU. Schwartz told Bianca about her interaction with Redding and questioned her about the identity of Patient CU's BCBA. Bianca responded that Patient CU did not have a BCBA.

84.     When Schwartz asked Bianca Riddle who had drafted the ISP for Patient CU, Bianca told Schwartz that she had drafted the ISP's, along with Katia Riddle and Heather Adkins, the latter of whom worked as a billing assistant for Katia Riddle.

85.     Neither the Riddle sisters nor Adkins were licensed to provide ABA Therapy in the Commonwealth or certified as BCBAs or BCaBAs.

86.     Over time, Schwartz learned that non-licensed individuals routinely prepared ISPs for patients. Indeed, Schwartz personally observed Bianca Riddle drafting many ISPs, and in the Fall of 2020, Adkins admitted to Schwartz that she had drafted ISPs per Bianca request.

87.     In addition, Schwartz learned that Bianca Riddle was also completing unsupervised initial assessments on patients, which she personally observed Bianca perform on numerous occasions.

88.     Schwartz is also personally aware based on her review of Connex billing records that Connex was billing the Medicaid program for patients who were receiving treatment from unlicensed providers, including patient CU.

89.     For example, Connex billing records show that Connex billed Medicaid for thousands of dollars for service to Patient CU and received reimbursement from Medicaid for at least hundreds of dollars.

90.     Upon information and belief, Defendant Katia Riddle, the Finance and Production Manager at Connex, was not only aware of this fraudulent scheme but also actively participated in the scheme by preparing ISPs and submitting fraudulent bills for services performed by unlicensed

providers to the MCO.

91.     Upon information and belief, each of the Individual Defendants were aware that Connex was billing and receiving reimbursement for services performed by unlicensed providers but declined at any time to return or report overpayments to the Commonwealth, the Secretary of HHS, or any other intermediary or contractor.

**ii.     Forging Data Sheets to inflate Medicaid bills**

92.     In July 2020, Schwartz also became aware of a BT who had been preparing fraudulent data sheets for a patient that resulted in hundreds of fraudulent service hours billed to Medicaid.

93.     Specifically, in or around the end of June 2020, the mother of Patient KBW contacted a Connex representative to advise them that their BT, Tiffany Williams, had repeatedly cancelled her appointments for the previous three to four months.

94.     Bianca Riddle asked Schwartz to look into this issue, at which time Schwartz uncovered numerous data sheets for Patient KBW for that time period.

95.     Around this time, Schwartz learned that Williams had been forging data sheets for months..

96.     Specifically, Williams had asked Patient KBW's mother to sign a blank data sheet prior to each scheduled appointment. Williams would later cancel the appointment but fill out the data sheet as if she had attended.

97.     As a result, Connex billed and received reimbursement from Medicaid for hundreds of service hours reflected in Williams' data sheets that were never actually completed.

98.     During the time that Williams was preparing fraudulent data sheets concerning Patient KBW's treatment, Williams was almost entirely unsupervised by a licensed provider,

which Connex and the Individual Defendants knew was in violation of DMAS regulations.

99. After Bianca Riddle was informed about Williams' fraud, she told Williams, Schwartz, and others at Connex that she was going to report the wrongful billing submissions to Medicaid.

100. Liguori dissuaded Bianca Riddle from making such a report at that time because a Medicaid audit or investigation might reveal the bills that Connex had repeatedly submitted to Medicaid for treatment by unlicensed providers.

101. Schwartz personally observed conversations between Bianca Riddle and Liguori whereby the two conspired to withhold information about the fraudulent data sheets from Medicaid.

102. Upon information and belief, Defendant Katia Riddle, the Finance and Production Manager at Connex, was not only aware of this fraudulent scheme but also actively participated in the scheme by reviewing and/or personally submitting these fraudulent bills to Medicaid.

103. Upon information and belief, Malgrem, who regularly conversed with Liguori and the Riddle sisters about billing matters, were also aware of and parcitipated in the fraudulent scheme.

104. Upon information and belief, Defendants were aware of the fraudulent bills and reimbursements but declined at any time to return or report overpayments to the Commonwealth, the Secretary of HHS, or any other intermediary or contractor.

### iii. Misrepresenting the Nature of Treatment on Billing to Inflate Medicaid Bills

105. In addition, Schwartz learned during her tenure at Connex that Connex was billing Medicaid for unauthorized group therapy sessions by falsely representing to the MCO that it was performing individual sessions.

106.    Specifically, Connex frequently assigned BTs to multiple patients at once to help compensate for staffing deficiencies.

107.    Though Schwartz had questioned Bianca Riddle about whether Connex was able to bill Medicaid for these group sessions, Bianca had falsely informed Schwartz that the sessions could be billed under a special Medicaid code for group therapy.

108.    From at least the months of September to November 2020, Connex engaged in multiple group sessions with patients.

109.    Records show that for the month of November 2020 alone, Connex billed and received reimbursement from Medicaid hundreds of dollars of service that Connex fraudulently represented to be individual therapy sessions.

110.    These bills submitted to Medicaid were actually based on therapy sessions that, if performed at all, were performed via group therapy.

111.    In October 2020, Schwartz witnessed a conversation between Bianca Riddle and Liguori in which Liguori specifically informed Bianca Riddle that Connex could not lawfully bill group therapy sessions to Medicaid.

112.    Notwithstanding this conversation, Connex records show that the company continued to bill and receive reimbursement from Medicaid for group therapy sessions through at least December 2020.

113.    Specifically, Connex records show that in November 2020 alone, Connex collected thousands of dollars in payments from the Medicaid program from Patients GM and MSR, each of whom were treated exclusively through group sessions at that time.

114.    Upon information and belief, Defendant Katia Riddle, the Finance and Production Manager at Connex, was not only aware of this fraudulent scheme but also actively participated in

the scheme by reviewing and/or personally submitting these fraudulent bills to Medicaid.

115.   Upon information and belief, the Defendants were aware of this scheme but have not returned or reported overpayments to the Commonwealth, the Secretary of HHS, or any other intermediary or contractor.

### iv.   Inflating Hours on Medicaid Bills

116.   In or around July or August 2020, Schwartz spoke with Katia Riddle about Connex's billing practices.

117.   Around that time, Katia Riddle informed Schwartz that Connex frequently submitted bills to Medicaid before scheduled therapy sessions. In instances where a billed session was cancelled—something that happened frequently—Connex did not notify Medicaid or any Medicaid official about the cancellation, nor did Connex reimburse the MCO for payments received.

118.   Later, Katia Riddle gave Schwartz access to Connex's Medicaid billing records that showed the therapy sessions for which Connex was billing Medicaid, as well as dates of the sessions and the amounts billed.

119.   In her role as Regional Manager, Schwartz also had access to the provider schedules, which she was able to compare with the Medicaid billing records to determine whether the providers had actually performed the services for which Connex had billed.

120.   Using these records, Schwartz was able to uncover numerous instances where Connex had substantially inflated bills to charge the MCO for more time than was actually spent with a patient or where Connex had billed the MCO for sessions that were not performed at all.

121.   For the month of November 2020 alone, Connex billed Medicaid (via the MCO) and received reimbursement for thousands of dollars of service that it did not perform. The records

for that month show the following:

| Service Date | Patient | Units Billed | Units Worked | Amount Overbilled and Reimbursed |
|---|---|---|---|---|
| Nov. 2 | MSR | 20 | 12 | $120.00 |
| Nov. 2-5 | KG | 56 | 42 | $210.00 |
| Nov. 3-4 | GM | 40 | 36 | $60.00 |
| Nov. 5 | GM | 20 | 16 | $60.00 |
| Nov. 5-6 | MSR | 40 | 8 | $480.00 |
| Nov. 5-6 | TM | 32 | 16 | $240.00 |
| Nov. 9-10 | CW | 28 | 16 | $180.00 |
| Nov. 9-10 | MSR | 40 | 12 | $420.00 |
| Nov. 9-10 | GM | 40 | 36 | $60.00 |
| Nov. 9-19 | KG | 112 | 84 | $420.00 |
| Nov. 11-12 | GM | 40 | 36 | $60.00 |
| Nov. 11-13 | CW | 40 | 36 | $60.00 |
| Nov. 12-13 | MSR | 40 | 0 | $600.00 |
| Nov. 12-19 | LK | 80 | 34 | $690.00 |
| Nov. 16-20 | MaR | 72 | 16 | $840.00 |
| Nov. 24-27 | GM | 60 | 0 | $900.00 |
| Nov. 16-17 | GM | 40 | 12 | $420.00 |
| Nov. 23-24 | MaR | 32 | 16 | $240.00 |

*1 Unit = 15 minutes.                                    **TOTAL: $5,985.00**

122.   Upon information and belief, Defendant Katia Riddle, the Finance and Production

Manager at Connex, was not only aware of this fraudulent scheme but also actively participated in

the scheme by reviewing and/or personally submitting these fraudulent bills to Medicaid.

123.    Moreover, upon information and belief, each of the Defendants were aware and regularly communicated about this fraudulent billing scheme.

124.    Upon information and belief, Defendants declined at any time to return or report overpayments to the Commonwealth, the Secretary of HHS, or any other intermediary or contractor.

v.    **Block Billing on Medicaid Bills**

125.    Upon review of the records, Schwartz also observed that Connex engaged in "block" billing in an apparent effort to obfuscate the fact that its bills were fraudulent.

126.    Specifically, Connex submitted bills to the MCO for services allegedly performed over a wide range of dates; however, the services identified in those bills had either already been billed separately or had never been performed at all.

127.    The MCO submitted only partial reimbursements for these "block" bills, presumably because it recognized that some of the billing was duplicative.

128.    The MCO did not realize, however, that Connex had not performed any services at all on the non-duplicative service dates listed in the block billing.

129.    Accordingly, Connex was able to secure payments from Medicaid for hundreds of dollars of service that it never performed.

130.    Billing from November 2020 alone shows more than $1300 of payments collected based on this fraudulent block billing scheme, including a $900 payment based on a fraudulent bill for service dated November 9-23 (Patient GM) and $480 payment based on a fraudulent bill for service dated November 11-13 (Patient TM).

131.    Upon information and belief, Defendant Katia Riddle, the Finance and Production

Manager at Connex, was not only aware of this fraudulent scheme but also actively participated in the scheme by submitting the block bills at the same time that she submitted duplicate bills for services performed in the same date range.

132.    Moreover, upon information and belief, each of Defendants were aware of this fraudulent block billing practice and regularly communicated about this and other fraudulent practices but declined at any time to report or return overpayments to the Commonwealth, the Secretary of HHS, or any other intermediary or contractor.

### E. Bianca Riddle's Fraudulent Income Claims

133.    During her tenure at Connex, Schwartz also learned that Bianca Riddle falsified her income in Medicaid applications so that Bianca could put both herself and her son on Medicaid.

134.    In or around February 2020, shortly after Schwartz started working at Connex, Schwartz was speaking to Bianca Riddle about incorporating Schwartz into the payroll system. During that conversation, Bianca told Schwartz that she did not write herself a check as an employee of Connex and that the "company card is [her] check."

135.    Over time, Schwartz came to realize this was true. Indeed, Schwartz spent a fair amount of time with Bianca Riddle outside of the office and routinely witnessed Bianca spending significant sums of money on plainly personal expenses, such as personal clothing and vacations.

136.    In or around November 2020, Schwartz was in the process of preparing her own Medicaid application for her children. Schwartz was having some trouble completing the paperwork, and because Bianca Riddle was heavily involved in the Medicaid billing process for Connex, Schwartz asked Bianca for help with her application.

137.    Bianca Riddle briefly reviewed Schwartz's application documents and expressed some uncertainty about whether Schwartz's children qualified for Medicaid reimbursements.

138.    Bianca Riddle then told Schwartz that Bianca and her son were on Medicaid because she knows how to "game the system." When Schwartz pressed for more details, Bianca told her that she is able to be on Medicaid because she uses the company card for personal expenses and therefore falsely represents to the government that she has no income.

139.    Upon information and belief, Bianca Riddle had been receiving and continued to receive reimbursement from the Medicaid program for medical expenses for herself and her son.

140.    After Schwartz learned about Bianca Riddle's fraudulent representations to the Medicaid program, Schwartz stopped seeking help from Bianca with her Medicaid application.

### F. Schwartz's Termination

141.    In or around December 2020, many Connex employees' paychecks started to bounce.

142.    When questioned about this problem, Bianca Riddle advised the employees that Connex was having some administrative payroll problems and that Connex would need to give the employees handwritten checks.

143.    At or around this time, Schwartz met with Barbara Riddle, who inexplicably showed Schwartz the Connex Gloucester bank account—the account from which employee paychecks were drawn—via an online portal. Schwartz saw that the Gloucester account was nearly empty.

144.    When Schwartz questioned Barbara Riddle about the account, Barbara explained that Bianca Riddle had been taking a trip to Colorado to set up a new business during which Bianca had effectively drained the account using the company card.

145.    On Friday, December 4, 2020, Barbara Riddle sent an email to the Individual Defendants stating that Schwartz was going to be working as her assistant and that Barbara was

going to be cutting off the company cards. Schwartz was not aware that Barbara had sent this email until later, and Schwartz had never agreed with Barbara about such an arrangement.

146.    Upon information and belief, Barbara informed the Individual Defendants that she had shown Schwartz the Gloucester bank account.

147.    That night, Schwartz received an administrative email from her Google account stating that Bianca Riddle had tried and failed to transfer information from Schwartz's account. Schwartz texted Bianca Riddle asking for an explanation, but she received no response.

148.    On Monday, December 7, 2020, Schwartz arrived at work to find that her email account access had been blocked.

149.    Three days later, on December 10, Schwartz participated in a scheduled meeting with Malmgren and Carrie Gemme, the Human Resources representative. During the meeting, Schwatz was told that there had been a change of ownership at Connex and that her position was no longer available.

150.    When Schwartz asked about the ownership change, Gemme told Schwartz that Liguori and Malmgren now owned the company.

151.    Later that day, Schwartz emailed Gemme with some follow-up questions about the termination. Gemme responded with a condescending email telling Schwartz to "leave the premises immediately."

152.    In the same email, Gemme inexplicably asserted that Schwartz was under a confidentiality agreement and threatened legal action for unlawful disclosures. Schwartz never signed a confidentiality agreement with Connex.

### COUNT I—FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B)
### (Against Connex)

153.    Relator incorporates the preceding paragraphs by reference.

154. Defendant Connex made, submitted, or caused to be made or submitted false and fraudulent statements and claims to the United States or engaged in a fraudulent course of conduct toward the United States by committing acts that include, but are not necessarily limited to:

> i) billing the United States, via the Medicaid program, for services performed by unlicensed providers;
>
> ii) recklessly failing to supervise an employee who forged data sheets to inflate Medicaid bills;
>
> iii) misrepresenting the nature of treatment on Medicaid Bills;
>
> iv) inflating hours on Medicaid bills; and
>
> v) presenting fraudulent block bills to Medicaid.

155. Connex made or caused to be made these statements or claims with actual knowledge that the statements or claims were false or fraudulent or, at the least, deliberate ignorance or reckless disregard of the truth or falsity of the statements or claims.

156. Connex's false and fraudulent claims and statements were material such that the United States, via the Medicaid program, would not have reimbursed or submitted payment to Connex if it had been aware that the statements and claims by Connex were false.

157. As a direct and proximate result of Connex's false and fraudulent statements and claims, the United States has paid or forfeited substantial sums of money and incurred substantial damages.

### COUNT II—FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B)
### (Against Bianca Riddle)

158. Relator incorporates the preceding paragraphs by reference.

159. Defendant Bianca Riddle made, submitted, or caused to be made or submitted false and fraudulent statements and claims to the United States or engaged in a fraudulent course of

conduct toward the United States by committing acts that include, but are not necessarily limited to:

i) Misrepresenting herself as a licensed provider in order to engage in and bill for unlawful treatment of patients;

ii) misrepresenting, or causing to be misrepresented, the nature of treatment on Medicaid bills; and

iii) misrepresenting to the Medicaid program that she did not have an income in order to procure payments from the Medicaid program for herself and her family.

160. Bianca Riddle made or caused to be made these statements or claims with actual knowledge that the statements or claims were false or fraudulent or, at the least, deliberate ignorance or reckless disregard of the truth or falsity of the statements or claims.

161. Bianca Riddle's false and fraudulent claims and statements were material such that the United States, via the Medicaid program, would not have reimbursed or submitted payment to Connex or to Bianca Riddle and her family if it had been aware that the statements and claims by Bianca Riddle were false.

162. As a direct and proximate result of Bianca Riddle's false and fraudulent statements and claims, the United States has paid or forfeited substantial sums of money and incurred substantial damages.

## COUNT III—FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) and (B)
### (Against Katia Riddle)

163. Relator incorporates the preceding paragraphs by reference.

164. Defendant Katia Riddle made, submitted, or caused to be made or submitted false and fraudulent statements and claims to the United States or engaged in a fraudulent course of

23

conduct toward the United States by committing acts that include, but are not necessarily limited to:

        i)        Misrepresenting herself as a licensed provider in order to engage in and bill for unlawful treatment of patients;

        ii)      misrepresenting, or causing to be misrepresented, the nature of treatment in Medicaid bills; and

        iii)     inflating or causing to be inflated the number of service hours on Medicaid bills;

        iv)     presenting, or causing to be presented, fraudulent block bills to Medicaid.

165.    Katia Riddle made or caused to be made these statements or claims with actual knowledge that the statements or claims were false or fraudulent or, at the least, deliberate ignorance or reckless disregard of the truth or falsity of the statements or claims.

166.    Katia Riddle's false and fraudulent claims and statements were material such that the United States, via the Medicaid program, would not have reimbursed or submitted payment to Connex if it had been aware that the statements and claims by Katia Riddle were false.

167.    As a direct and proximate result of Katia Riddle's false and fraudulent statements and claims, the United States has paid or forfeited substantial sums of money and incurred substantial damages.

### COUNT IV—FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)
### (Against all Defendants)

168.    Relator incorporates the preceding paragraphs by reference.

169.    Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States in ways that include, but are not necessarily limited to the following:

i) Failing to properly report fraudulent bills submitted to and paid by the United States for services performed by unlicensed providers;

ii) failing to properly report fraudulent bills submitted to and paid by the United States based on fraudulent data sheets prepared by an employee;

iii) failing to properly report fraudulent bills submitted to and paid by the United States based on misrepresentations about the nature of treatment to patients;

iv) failing to properly report fraudulent bills submitted to and paid by the United States that were either duplicative or based on inflated or unperformed hours.

170. Defendants' concealment or improper avoidance of obligations was done knowing of the obligation to report overpayments or false or fraudulent statements and claims.

171. Moreover, Defendants' concealment or improper avoidance of obligations was done with actual knowledge that the statements or claims were false or fraudulent or, at the least, deliberate indifference or reckless disregard of the truth or falsity of the statements or claims.

172. Defendants' concealment or improper avoidance of obligations were material such that the United States, via the Medicaid program, would not have reimbursed or submitted payment to Connex or would have otherwise been reimbursed by Connex for overpayments had Defendants properly reported the false or fraudulent statements and claims.

173. As a direct and proximate result of Defendants' concealment or improper avoidance of obligations, the United States has paid or forfeited substantial sums of money and incurred substantial damages.

## COUNT V—FALSE CLAIMS IN VIOLATION OF Va. Code 8.01-216.3(A)(1) and (2)
### (Against Connex)

174.    Relator incorporates the preceding paragraphs by reference.

175.    Defendant Connex made, submitted, or caused to be made or submitted false and fraudulent statements and claims to the Commonwealth or engaged in a fraudulent course of conduct toward the Commonwealth by committing acts that include, but are not necessarily limited to:

    vi)    billing the Commonwealth, via the Medicaid program, for services performed by unlicensed providers;

    vii)    recklessly failing to supervise an employee who forged data sheets to inflate Medicaid bills;

    viii)    misrepresenting the nature of treatment on Medicaid Bills;

    ix)    inflating hours on Medicaid bills; and

    x)    presenting fraudulent block bills to Medicaid.

176.    Connex made or caused to be made these statements or claims with actual knowledge that the statements or claims were false or fraudulent or, at the least, deliberate ignorance or reckless disregard of the truth or falsity of the statements or claims.

177.    Connex's false and fraudulent claims and statements were material such that the Commonwealth, via the Medicaid program, would not have reimbursed or submitted payment to Connex if it had been aware that the statements and claims by Connex were false.

178.    As a direct and proximate result of Connex's false and fraudulent statements and claims, the Commonwealth has paid or forfeited substantial sums of money and incurred substantial damages.

## COUNT VI—FALSE CLAIMS IN VIOLATION OF Va. Code 8.01-216.3(A)(1) and (2)
### (Against Bianca Riddle)

179.    Relator incorporates the preceding paragraphs by reference.

180.    Defendant Bianca Riddle made, submitted, or caused to be made or submitted false and fraudulent statements and claims to the Commonwealth or engaged in a fraudulent course of conduct toward the Commonwealth by committing acts that include, but are not necessarily limited to:

      iv)      Misrepresenting herself as a licensed provider in order to engage in and bill for unlawful treatment of patients;

      v)      misrepresenting, or causing to be misrepresented, the nature of treatment on Medicaid bills; and

      vi)      misrepresenting to the Medicaid program that she did not have an income in order to procure payments from the Medicaid program for herself and her family.

181.    Bianca Riddle made or caused to be made these statements or claims with actual knowledge that the statements or claims were false or fraudulent or, at the least, deliberate ignorance or reckless disregard of the truth or falsity of the statements or claims.

182.    Bianca Riddle's false and fraudulent claims and statements were material such that the Commonwealth, via the Medicaid program, would not have reimbursed or submitted payment to Connex or to Bianca Riddle and her family if it had been aware that the statements and claims by Bianca Riddle were false.

183.    As a direct and proximate result of Bianca Riddle's false and fraudulent statements and claims, the Commonwealth has paid or forfeited substantial sums of money and incurred substantial damages.

27

**COUNT VII—FALSE CLAIMS IN VIOLATION OF Va. Code 8.01-216.3(A)(1) and (2)**
**(Against Katia Riddle)**

184.    Relator incorporates the preceding paragraphs by reference.

185.    Defendant Katia Riddle made, submitted, or caused to be made or submitted false and fraudulent statements and claims to the Commonwealth or engaged in a fraudulent course of conduct toward the Commonwealth by committing acts that include, but are not necessarily limited to:

        v)    Misrepresenting herself as a licensed provider in order to engage in and bill for unlawful treatment of patients;

        vi)    misrepresenting, or causing to be misrepresented, the nature of treatment in Medicaid bills; and

        vii)    inflating or causing to be inflated the number of service hours on Medicaid bills;

        viii)    presenting, or causing to be presented, fraudulent block bills to Medicaid.

186.    Katia Riddle made or caused to be made these statements or claims with actual knowledge that the statements or claims were false or fraudulent or, at the least, deliberate ignorance or reckless disregard of the truth or falsity of the statements or claims.

187.    Katia Riddle's false and fraudulent claims and statements were material such that the Commonwealth, via the Medicaid program, would not have reimbursed or submitted payment to Connex if it had been aware that the statements and claims by Katia Riddle were false.

188.    As a direct and proximate result of Katia Riddle's false and fraudulent statements and claims, the Commonwealth has paid or forfeited substantial sums of money and incurred substantial damages.

28

## COUNT VIII—FALSE CLAIMS IN VIOLATION OF Va. Code § 8.01-216.3(A)(8)
### (Against all Defendants)

189.    Relator incorporates the preceding paragraphs by reference.

190.    Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Commonwealth in ways that include, but are not necessarily limited to the following:

v)      Failing to properly report fraudulent bills submitted to and paid by the Commonwealth for services performed by unlicensed providers;

vi)     failing to properly report fraudulent bills submitted to and paid by the Commonwealth based on fraudulent data sheets prepared by an employee;

vii)    failing to properly report fraudulent bills submitted to and paid by the Commonwealth based on misrepresentations about the nature of treatment to patients;

viii)   failing to properly report fraudulent bills submitted to and paid by the Commonwealth that were either duplicative or based on inflated or unperformed hours.

191.    Defendants' concealment or improper avoidance of obligations was done knowing of the obligation to report overpayments or false or fraudulent statements and claims.

192.    Moreover, Defendants' concealment or improper avoidance of obligations was done with actual knowledge that the statements or claims were false or fraudulent or, at the least, deliberate indifference or reckless disregard of the truth or falsity of the statements or claims.

193.    Defendants' concealment or improper avoidance of obligations were material such that the Commonwealth, via the Medicaid program, would not have reimbursed or submitted payment to Connex or would have otherwise been reimbursed by Connex for overpayments had

29

Defendants properly reported the false or fraudulent statements and claims.

194.    As a direct and proximate result of Defendants' concealment or improper avoidance of obligations, the Commonwealth has paid or forfeited substantial sums of money and incurred substantial damages.

## PRAYER FOR RELIEF

195.    WHEREFORE, Realtor respectfully requests that the Court enter judgment in her favor granting her legal and equitable relief as the Court may deem just, including, but not limited to:

a.  an amount equal to three times the amount of damages the United States and the Commonwealth have sustained as a result of Defendants' actions;

b.  the maximum civil penalty for each violation of the FCA and the VFATA;

c.  the maximum relator fee permitted under the FCA and the VFATA;

d.   attorneys' fees and costs; and

e.  any other relief afforded by law and which the Court deems just and proper.

## JURY TRIAL DEMAND

Relator Ashley Schwartz demands a trial by jury on all triable issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: May 4, 2021

Respectfully submitted,

_____/s/_____

Ben D. Johnson (VSB No. 90812)
PIERCE MCCOY, PLLC
313 East Broad St., Suite 315
Richmond, Virginia 23219
Tel: 804-413-4021
Fax: (757) 257-0387
bjohnson@piercemccoy.com

Joshua L. Jewett (VSB No. 76884)
PIERCE MCCOY, PLLC
101 West Main Street, Suite 101
Norfolk, Virginia 23510
Tel: (757) 901-4382
Fax: (757) 257-0387
jjewett@piercemccoy.com

*Counsel for Relator Ashley Schwartz*